UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X     Docket No.: 22-cv-2949-ALC
TODD BROWN,

                                  Plaintiff,

                    -against-                              **SECOND AMENDED**
                                                          **COMPLAINT**
NEW YORK CITY TRANSIT AUTHORITY,
METROPOLITAN           TRANSPORTATION
AUTHORITY, SARAH E. FEINBERG, CAROLYN
POKORNY, JOSEPH NASELLA, and JOHN and
JANE DOE (said names being fictitious, the persons        **JURY TRIAL REQUESTED**
intended being those who aided and abetted the
unlawful conduct of the named Defendants),

                                  Defendants.
----------------------------------------------------------X

        Plaintiff **TODD BROWN** ("Plaintiff" or "Brown"), by his attorneys, **MADUEGBUNA**

**COOPER LLP**, for his Second Amended Complaint alleges:

        **I.      THE NATURE OF THIS ACTION**

        1.      This is a selective enforcement case. Black Track Inspectors were targeted by

Defendants for investigation and termination while white Track Inspectors responsible for

crumbling tracks were let off the hook.

        2.      This discriminatory conduct also endangered the public. Defendants ignored

broken down track conditions in Queens while focusing on firing Black employees in the Bronx,

where track conditions were safe.

        3.      Between February and August 2019, local media reported about dangerous falling

debris from the No. 7 elevated subway tracks over Roosevelt Avenue in Queens.

        4.      These sections of the No. 7 elevated subway tracks were mostly inspected and

maintained by white Track Inspectors and their supervisors.

5.      Despite the known danger, Defendants METROPOLITAN TRANSPORTATION AUTHORITY ("MTA") and its Inspector General CAROLYN POKORNY of the Office of the MTA Inspector General ("OIG") and New York City Transit Authority ("NYCTA") waited until January 2020 to investigate these maintenance issues.

6.      But NYCTA, MTA OIG and POKORNY did not investigate the white Track Inspectors responsible for the No. 7 track in Queens even though their own report justified starting the investigation based on news reports from Queens.

7.      Instead, MTA OIG and POKORNY investigated a "test group" of seven mostly Black and non-white Track Inspectors in the Bronx on elevated portions of the Nos. 2, 4 and 6 lines that were fed to them by Defendant NASELLA.

8.      Plaintiff Todd Brown, a Black man, is a Bronx Track Inspector subjected to selective enforcement based on his race and color.

9.      As part of this selective enforcement, Defendants investigated Brown in a "test" program and filed disciplinary charges seeking his termination.

10.     Brown was suspended without pay for several months during the COVID-19 pandemic, causing him nearly $50,000 in lost salary.

11.     In contrast, Brown's supervisors who were white were not disciplined despite POKORNY's OIG report concluding that the supervisors were not doing their job.

12.     In the end, NYCTA did not show that Brown's tracks had defects or were unsafe.

13.     As a result, Brown brings this action for injunctive relief, declaratory judgment and money damages to remedy discrimination and retaliation on the basis of race and color under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.* ("Title VII"); 42

U.S.C. § 1981 as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) ("Section 1981") pursuant to 42 U.S.C. § 1983 ("Section 1983"); the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution ("Equal Protection Clause"); New York State Human Rights Law, § 296, *et seq.* ("NYSHRL"); and, New York City Human Rights Law, § 8-107, *et seq.* ("NYCHRL").

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     This Court has supplemental jurisdiction over the state causes of action pleaded.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the underlying events took place in this district.

## III.     PROCEDURAL REQUIREMENTS

17.     On September 14, 2021, Brown filed charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII.

18.     The EEOC issued Brown a Right to Sue Notice on January 12, 2022, which he received on January 13, 2022.

19.     Brown filed this lawsuit within 90 days of receiving the Right to Sue Notice.

20.     After filing this action, Brown served the complaint on the N.Y.C. Commission of Human Rights and the Corporation Counsel of the City of New York, in accordance with N.Y.C. Administrative Code Section 8-502(c).

## IV.     PARTIES

21.     Brown is a 53-year-old Black male.

22.     Brown is a resident of the City and State of New York, residing in New York County, New York.

23.     Defendant NYCTA is a public-benefit authority under the management of Defendant MTA as operating units, organized and existing under and by virtue of the laws of the State of New York.[1]

24.     NYCTA oversees the mass transportation systems in New York City and surrounding areas.

25.     Defendant MTA was created under New York law as "a body corporate and politic constituting a public benefit corporation." N.Y. Pub. Auth. L. § 1263.[2] Its purpose is "the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district." *Id.* § 1264.

26.     The MTA's Inspector General is also an employee of the MTA claim as the Public Authorities Law creates the Inspector General's office "in the metropolitan transportation authority." N.Y. Pub. Auth. Law § 1279(1).[3]

27.     The Office of the Inspector General is the investigative arm of the MTA, responsible for conducting, monitoring and overseeing MTA activities, programs and employees.

28.     Defendant SARAH E. FEINBERG ("FEINBERG") served as Interim President of the NYCTA until her resignation on July 31, 2021 and the New York State Legislature's failure to approve her as Chairperson of the MTA.

29.     FEINBERG is a white female.

---

[1] *Munafo v. MTA*, 285 F.3d 201, 204 (2d Cir. 2002).
[2] *Ojeda v. MTA*, 41 F.4th 56, 60 (2d Cir. 2022).
[3] *Anemone v. MTA*, 410 F.Supp.2d 255, 271 (S.D.N.Y. 2006).

30.     At all relevant times, FEINBERG was responsible for ensuring that employees are not subjected to discriminatory or retaliatory practices and maintained oversight ability and overall management of the NYCTA, including deciding which employees should be investigated, issued disciplinary charges and suspended.

31.     FEINBERG is sued in her personal capacity for monetary damages.

32.     At all relevant times, POKORNY was the Inspector General of Defendant MTA.

33.     Upon information and belief, POKORNY is a non-Black female.

34.     POKORNY is sued in her personal capacity for monetary damages.

35.     At all relevant times, Defendant JOSEPH NASELLA ("NASELLA") was (and is) employed by NYCTA as the Assistant Chief Officer for Track System Maintenance at NYCTA's Linden Train Yard in Brooklyn, New York.

36.     NASELLA is a white male.

37.     At all relevant times, NASELLA was responsible for ensuring that employees are not subjected to discriminatory or retaliatory practices.

38.     As Assistant Chief Officer for Track System Maintenance with NYCTA, NASELLA has supervisory authority of the employees who supervise Track Inspectors, such as Brown, regardless of their work location, because NASELLA is responsible for promoting, transferring and disciplining supervisors.

39.     Specifically, Brown's Track Department is under the Maintenance of Way Department, of which NASELLA is the second-in-command, and NASELLA promoted and transferred the Level 2 Superintendents and Generals of the Track Department.

40.     NASELLA is sued in his personal capacity for monetary damages and in his official capacity for injunctive relief.

41.     At all relevant times, Defendants were acting under color of the statutes, ordinances, regulations, customs and usages of the United States and the State of New York, and under the authority of their respective positions or offices.

42.     At all relevant times, the individual defendants had authority to assign duties and responsibilities to employees; supervised and controlled employee work schedules and conditions of employment and possessed authority to investigate and file disciplinary charges against employees.

43.     At all relevant times, Defendants aided and abetted the discriminatory acts of each other taken against Plaintiff.

**V.     FACTS COMMON TO ALL CAUSES OF ACTION**

*Brown's Background with NYCTA*:

44.     Brown holds a Bachelor's degree from State University of New York College at Cortland.

45.     From 1998 to 2012, Brown was a maintenance worker for private employers.

46.     On November 25, 2013 Brown was hired by NYCTA as a Track Worker.

47.     Brown was responsible for maintaining, installing, inspecting, testing, altering and repairing the tracks and roadways in underground and elevated subways.

48.     Since November 4, 2018, Brown has been a full-rate Track Inspector.

49.     As of March 5, 2020, Brown had never been disciplined at NYCTA.

50.     Brown's supervisor, Maintenance Supervisor 2 Arnold Striggles, confirmed that Brown was a high performing Track Inspector and his track sections as of May 2020 were free of defects.

*Brown Engaged in Protected Activity on Social Media:*

51.     Brown is vocal on social media about NYCTA's unequal treatment of minority employees.

52.     In August 2019, Brown posted in a private Facebook group of over 13,000 NYCTA employees, complaining that NYCTA and MTA were freezing overtime despite the large number of serious system defects that needed to be corrected.

53.     On October 22, 2019, Brown posted in the group and complained that "the normal way of doing business in the NYCT which is to me systematically oppressive. And because we are mostly of color…"

54.     On November 9, 2019, Brown posted in another private Facebook group of over 4,000 NYCTA employees that Train Operators and Track Inspectors were going above and beyond their duties and effectively ran the City of New York. Brown's quote was taken out of context and printed on the front page of the New York Post, making the activities of the group and Brown's posts in particular front and center news.

55.     On December 6, 2019, in another Facebook group, Brown wrote that, "It's true the MTA Board are Racist Systematic Oppressors. They are outdated Good Il [sic] Boys club. We must publicly fight them," and "for the MTA Board to talk low of us is oppressive."

56.     At all relevant times, the individual defendants were aware of Brown's social media postings, because Jason Auer ("Auer"), a Maintenance Supervisor I, informed Brown in

late December 2019 that General Superintendent Brian Bellew ("Bellew") had heard from "higher-ups" about workers on Facebook complaining.

57.    On December 15, 2020, after Brown received disciplinary charges, he wrote on social media in response to a member discussing how he was not afraid to be fired, "They use I.G's to dig up and Trump charges on you. Going thru it now. There is systematic racism in the M.T.A…"

*The Elevated Subway Tracks in Queens had Dangerous Falling Debris:*

58.    Between February and August 2019, New York media reported about falling debris from the No. 7 elevated subway tracks over Roosevelt Avenue in Queens.

59.    On February 21, 2019, a wooden beam fell off the No. 7 track and smashed through a car's windshield, coming within inches of injuring the driver. Queens City Councilman Jimmy Van Bramer commented that the video of the near-miss was "one of the most frightening things I have ever seen… how this could ever happen must be the source of an immediate investigation by the MTA. Someone has to be held accountable."

60.    Around that time, Nassau County Legislator John R. Ferretti, Jr. had also complained to then-NYCTA President Andy Byford that old debris needed to be removed from under and above elevated train structures due to the dangers of falling onto traffic and pedestrians.

61.    On March 6, 2019, a hunk of heavy, jagged rusty metal fell from the 7 train tracks onto Roosevelt Avenue, two blocks away from the February 21 incident, and cracked the windshield of a parked car.

62.     On June 3, 2019, a woman walking under the 7 train tracks was nearly struck by another falling hunk of rusty metal.

63.     MTA officials told residents that the street was safe despite multiple incidents of falling debris in Queens.

64.     On August 21, 2019, two and a half months later, more debris fell from the 7 train tracks to Roosevelt Avenue below.

65.     At all relevant times, to the knowledge of NYCTA executives and managers, including FEINBERG, NASELLA and POKORNY, these sections of elevated subway tracks were mostly inspected and maintained by white Track Inspectors and their supervisors.

66.     The white Track Inspectors and their supervisors performed the same tasks as Plaintiff, work for the same department and were subject to the same tasks and standards of work and discipline, though they worked in different areas.

67.     For example, in January 2020, MTA OIG became aware of loose bolts on the elevated section of the 1 train, which was staffed by white Track Inspectors. OIG then warned Bellew that there might be a problem with the Track Investigators responsible for this section. However, the two white Track Inspectors who manned this section of the 1 line were neither investigated nor disciplined, even though one of the Track Inspectors had previously been found working at another job during his NYCTA work hours.

68.     In addition, when the MTA instituted a new phone app for all Track Inspectors to use during their inspections, pressure was put on Brown and other minority Track Inspectors in the Bronx to ensure they filled out every portion of the app during inspections, including recording the tracks they were on and flipping through multiple different pages. However, the

white Track Inspectors in Queens, including on the 7 line, were permitted to only take pictures and did not need to fuss with the app like minority Track Inspectors in the Bronx needed to do.

*NYCTA Discriminatorily Investigates Non-White Track Inspectors in the Bronx:*

69.     Despite knowing about multiple incidents with the No. 7 tracks in Queens, MTA OIG and POKORNY waited to investigate until January 2020.

70.     Yet, NYCTA, MTA OIG and POKORNY did not investigate the white Track Inspectors on the No. 7 tracks. Instead, they probed a "test group" of seven mostly non-white Track Inspectors, including Brown, on the elevated Nos. 2, 4 and 6 lines in the Bronx.

71.     From March 18 – 19, 2020, at the direction of POKORNY, during the first days of the COVID-19 shut-downs, OIG investigators watched the section of the No. 4 elevated tracks that Brown was assigned to inspect in the Bronx.

72.     Between February 2019 and March 2020, Brown was not aware of any reports of falling debris along any sections of the Nos. 2, 4 and 6 lines in the Bronx or any complaints about improper track inspections.

73.     Notably, NYCTA, MTA OIG and POKORNY began investigating Brown one month after he complained on social media about understaffing, three months after he complained that NYCTA's "normal way of doing business" is "systematically oppressive" and almost a year after the first report of falling debris.

74.     In a written report of December 28, 2020 ("OIG Report"), MTA OIG and POKORNY claimed that Brown wrote in his March 18 Inspection Reporting Form that he inspected the No. 4 line between the Kingsbridge Road Station and Woodlawn Avenue Station and the Jerome Lead and was deployed to address a trouble call.

75.     The OIG Report and POKORNY alleged that neither Brown nor any other Track Inspector inspected that track on March 18, 2020 and Brown's phone records showed that his cell phone usage while "purportedly inspecting the tracks would have interfered with his work and created a dangerous distraction."

76.     Based on this allegation, MTA OIG reviewed 40 additional work dates between April 1 and June 24, 2020 to examine Brown's cell phone and claimed excessive phone usage.

77.     However, on March 18, investigators just happened to miss Brown. He was also allowed to leave early because the Covid-19 pandemic had reduced the number of trains running, a detail which the MTA would have seen in Brown's attendance records. On the other days he was surveilled, Brown's workload was normal and performed at a high standard, and all the way up to the day he was interviewed by the MTA OIG.

78.     In addition, due to the number of callouts on account of Covid-19, the MTA used contract employees to conduct track work and gave their phone numbers to permanent employees like Brown, who were responsible for guiding the contract workers to the right location and coordinating what needed to be done. Brown also needed to call around for supplies and needed to make more calls than usual to find an employee who was actually on duty and able to obtain the supplies.

79.     The MTA OIG never directly observed allegedly distracting phone usage by Brown and the other minority Track Inspectors, yet still subpoenaed their phone records.

*MTA OIG Interrogates Brown*:

80.     On September 22, 2020, MTA OIG, at the direction of POKORNY, interrogated Brown about his cell phone use during track inspections and the investigators' erroneous claim

that they did not observe him conducting inspections on March 18 or 19, 2020.

81. The tone of the interrogation made clear that it was a mere formality, and that the results of the investigation had already been pre-determined. Although Brown answered truthfully and provided as much information as possible, the interrogators did not take the responses seriously, which is evident in the OIG Report, which makes references to Brown being unable to explain details and being contradicted.

82. Brown explained that he preferred to use his personal cell phone for work calls rather than the newly issued MTA phone and confirmed that he inspected the tracks on March 18 and 19.

83. During this period, the lead OIG investigator told Brown that he was one of the best Track Inspectors in New York City and knew that the job was dangerous.

84. There were also conflicting reasons for the interrogation, as the lead OIG investigator claimed during Brown's arbitration proceedings that the track inspectors had been randomly selected, yet claimed during the other inspectors' arbitration proceedings that MTA OIG had been given the names of employees to investigate.

85. Shortly after the interview, Brown was informed by Superintendent Ron DeMaria ("DeMaria"), a white male, several times that OIG had a "hard on for certain people" and would keep "digging and digging looking for anything."

86. DeMaria also told Brown that OIG kept calling him for information about Brown and his work.

87. In October 2020, Auer advised Brown that OIG "wanted to get rid of [Brown]."

88.     One month later, in December 2020, Brown was told by Supervisor 2 Juan Baez that NYCTA and MTA are racist and discipline minorities instead of whites.

89.     NYCTA, MTA OIG and POKORNY took these actions in retaliation for Brown's public complaints of discrimination and to scapegoat non-white Track Inspectors while protecting white Track Inspectors.

90.     Brown later learned from his union, Transport Workers Union ("TWU") Local 100, which had learned from MTA OIG investigators, that NASELLA personally "spoon fed" and/or referred Brown and six other, mostly non-white Track Inspectors to OIG for investigation.

91.     Despite the OIG Report concluding that Brown's supervisors were not doing their job overseeing Inspectors, no discipline was recommended for Brown's white supervisor.

92.     Moreover, it is widely known that NASELLA engaged in discriminatory behavior towards Black and minority Track Inspectors, such as Brown, and has been the subject of complaints filed with MTA's Department of Equal Employment Opportunity & Diversity ("EEO") by his subordinates and a petition calling for his removal.

93.     Specifically, NASELLA has openly said that he stops overtime for minority Track Inspectors because he does not want them earning more money than him.

94.     MTA OIG, who carried out the investigation, was aware that Brown and his six co-workers were Black and non-white when it selected the group of workers to investigate, because Track Inspectors in Queens are heavily white, while Track Inspectors in the Bronx are heavily Black and Brown.

95.     Given that MTA OIG investigators have in the past walked with Track Inspectors and Supervisors along the lines, they are well aware of the racial makeup of Track Inspectors in

different boroughs.

<u>*NASELLA Violated NYCTA and MTA Rules by Stealing Time and Funds*</u>

96.     In another example, NYCTA and MTA OIG discovered and ignored the fact that NASELLA created an MTA-funded electric charging station using MTA employee labor for a white supervisor's Tesla vehicle in Brooklyn, showing that NYCTA and MTA engage in selective enforcement based on race and color.

97.     Specifically, the MTA OIG found the charger in or around August 2020 and, upon investigation, discovered that 180 employee hours were used in its creation, it was paid for with an MTA credit card and it was strictly for personal use.

98.     In addition, all of the supervisors involved in building the charging station, including NASELLA, were white. Rather than impose true discipline, the MTA OIG merely told NASELLA to remove the charger and deliberately did not create an official report.

99.     Although NASELLA and his crew originally took the charging station down, it was immediately put back up, in continuing defiance of MTA and NYCTA rules and policies.

100.    Indeed, an MTA spokesperson confirmed that "Any theft of MTA resources would constitute a violation of MTA policy and law, and will not be tolerated."

101.    NASELLA and other white supervisors committed equally serious rule violations as Brown allegedly did, but the investigation and findings were disparate.

<u>*FEINBERG Personalizes Community Criticisms of the NYCTA*</u>:

102.    On April 7, 2020, a group of transit and community groups penned an open letter complaining about overcrowding of trains and buses due to reduced service stemming from COVID-19 that was harming Black and brown communities.

103.    In a *New York Magazine* interview on May 26, 2020, FEINBERG admitted that "I am personally, deeply offended by the suggestion that I, or anyone working for me or with me, would in any way discriminate… I thought it was absolutely outrageous, unfair, and appalling… Clearly I'm not over it. I'm not getting over that one."

104.    Upon information and belief, neither MTA OIG, EEO nor any other department addressed the complaints in the open letter nor investigated systemic racism in the NYCTA.

*FEINBERG Personally Reassigns Brown*:

105.    On December 13, 2020, FEINBERG ordered Brown removed from his daily work assignments, reassigned him to the lower "Track Worker" title and prohibited him from working without a supervisor present.

106.    In the days after FEINBERG's order, Brown's union informed FEINBERG that Brown would be filing a grievance.

107.    FEINBERG took the same actions against Brown's six co-workers in the Bronx, including four other Black male Track Inspectors, one Hispanic male, and one white, LGBTQ female (who shared a track section with a Black worker).

108.    In the OIG Report issued on December 28, 2020, two weeks after Brown's reassignment, MTA OIG claimed, at the direction of POKORNY, that Brown failed to conduct the track inspections, spent considerable time on his cell phone and should be terminated, and that the agency seek to recover at least 42 days that Brown was paid for conducting inspections.

109.    The OIG Report ignored the Track Inspectors that maintained the No. 7 tracks in Queens and used Brown as a scapegoat to distract from the failures of NYCTA and MTA to maintain and properly operate the subway system.

110. After the issuance of the OIG Report, Brown's co-workers told him that he was being targeted due to his social media activity advocating for minority employees.

*FEINBERG Personally Suspends Brown Without Pay*:

111. On December 29, 2020, Brown and the other six reassigned Black and minority Track Inspectors were served with Notices of Pre-Disciplinary Suspension and learned that FEINBERG personally suspended them without pay.

112. In or around January 2021, a union representative advised Brown to stay off social media to prevent NYCTA from targeting him.

113. On March 11, 2021, Brown attended his first disciplinary arbitration hearing, where it was agreed that Brown would be restored to service on April 9, 2021.

114. On March 17, 2021, during an MTA Board Meeting on Zoom, TWU International President John Samuelsen asked POKORNY about the MTA OIG targeting Black and Hispanic Track Inspectors provided by NASELLA and not investigating white Track Inspectors.

115. POKORNY dodged the question and claimed she could not respond because the OIG final report had not been released and the arbitration hearings were still on-going.[4]

116. It was only after POKORNY was confronted with the racial disparity of the Tesla charging station that the MTA board asked her to look into the issue, and she personally issued a report in August 2021.

117. POKORNY found that NASELLA had violated several rules and regulations, including the MTA All-Agency Code of Ethics § 4.02 and § 8.04, New York City Transit Rules 2(b), 10, 12(a)(10) and 13(b)(1), and Public Officers Law § 74(3)(h).

---

[4] *See* video at 2:36:42, available at https://new.mta.info/transparency/board-and-committee-meetings/march-2021

118.    While POKORNY found NASELLA guilty of several rules violations, she only asked that Transit discipline as they saw fit and did not recommend his termination, the opposite of what she requested be done to Brown.

119.    In the end, Transit only suspended NASELLA for two days, unlike the months of suspension that Brown received and only after the racially disparate discrimination was publicly aired at a virtual MTA board meeting.

*EEO Refuses to Investigate Brown's Complaint:*

120.    On April 2, 2021, while still suspended without pay, Brown submitted a complaint of race discrimination, retaliation and hostile work environment to MTA EEO. The complaint alleged that NYCTA targeted non-white Track Inspectors while white Track Inspectors with publicly reported fallen debris in their track sections were not investigated.

121.    On April 8, 2021, Brown received a letter from Joel C. Andrews, Vice President of MTA EEO, advising that his complaint would not be investigated.

122.    Instead of returning Brown to payroll on April 9, NYCTA delayed returning him to payroll until May 18, 2021 in retaliation for Brown's complaints.

123.    The delay caused Brown to miss promotional opportunities that he could apply for and accrued vacation, leave and sick time.

*Brown is Forced to Attend More Arbitration Hearings:*

124.    On May 17, 2021, after attending three arbitration hearings, the Arbitrator issued his Opinion & Award rejecting most of the charges against Brown.

125.    The Arbitrator sentenced Brown to 6-months' time served without pay. The Arbitrator found Brown guilty of two charges stemming from making false and/or misleading

entries on inspection reports because MTA OIG said they did not see Brown on two inspection shifts and failure to fully cooperate with MTA OIG's investigation by giving "evasive" answers.

126. Notably, the Arbitrator dismissed the other two charges for failure to complete daily track inspections and making false and/or misleading entries on inspection reports on 40 separate dates between April 1 and June 24, 2020.

127. The Arbitrator never concluded that Brown's tracks were unsafe.

128. The Arbitrator was wrong insofar as he found Brown guilty, in the face of evidence to the contrary and reliance upon evidence not properly presented during the arbitration proceedings.

129. On May 18, 2021, Brown was finally permitted to return to work as a Track Inspector after losing nearly $50,000 in salary.

130. In May 2021, MTA OIG, at the direction and approval of POKORNY, released its final report about insufficient supervision of Track Inspectors and made several recommendations to NYCTA to adopt agency-wide policies to improve the supervision of Track Inspectors and track safety.

131. Consistent with its selective enforcement, the OIG Report ignored the falling debris from the No. 7 train tracks in Queens or discipline for the white Track Inspectors whose shoddy work started the public outcry and investigation to begin with.

*NYCTA Denied Brown Overtime Work Due to Discrimination and Retaliation:*

132. After May 11, 2020, when Brown would ask for overtime work, his requests were denied, allegedly due to a surplus of Track Inspectors making overtime work unnecessary.

133. However, when Brown requested time off two months later in July 2020, his request was denied, allegedly due to a shortage of Track Inspectors.

134. NYCTA's overtime denial was a further attempt to discriminate and retaliate against Brown on account of his race, color and discrimination complaints.

*Defendants are Still Aware of Brown's Complaints:*

135. On February 24, 2024, NASELLA called Track Chairman Carlos Albert ("Albert") and advised that he was aware of Brown continuing to post in private Facebook groups for NYCTA employees.

136. Shortly afterwards, Albert warned Brown about NASELLA's call and advised Brown to be careful posting in such groups because NYCTA managers were present and aware of employee complaints and could, conceivably, retaliate against such employees.

137. Defendants took the above actions to deprive Brown of employment opportunities and other contractual opportunities because of his race, color and discrimination complaints.

138. As a proximate result of Defendants' unlawful conduct, Brown suffered and continues to suffer monetary loss and damages.

139. As a further proximate result of Defendants' actions, Brown suffered emotional distress, lasting embarrassment, humiliation and anguish, as well as other incidental and consequential damages and expenses.

140. Defendants' conduct was outrageous and malicious, intended to injure Brown, and carried out with reckless indifference to Brown's protected civil rights, thereby entitling him to punitive damages.

141. Brown has no complete, plain, clear or adequate remedy at law.

142.    Defendants must be restrained from further discrimination against Brown and directed to cease and desist from their unlawful acts against him. Brown believes that Defendants' unlawful acts against him will continue until this Court, by injunction and/or its judgment, compels otherwise.

## FIRST COUNT AGAINST DEFENDANT NYCTA
### (Race and Color Discrimination in violation of Title VII)

143.    Brown repeats and realleges each allegation in each paragraph above.

144.    Defendants subjected Brown to differential terms and conditions of employment because of his race and color.

145.    These differential terms and conditions of employment include the selective enforcement of investigative and disciplinary action but are not limited to (i) being referred for investigation by a supervisor, NASELLA, with a history of EEO complaints; (ii) reassigned to a lower Track Worker title; (iii) suspended without pay for five months, while white supervisors faced no discipline; (iv) forced to attend multiple arbitration hearings based on sham disciplinary charges; (v) denied overtime opportunities and (vi) denied overtime pay he completed.

146.    All of the above actions were taken by the NYCTA to deprive Brown of employment and other contractual opportunities on account of his race and color.

147.    Because of the willful and deliberate actions of the NYCTA, and as a proximate cause, Brown has been denied his right in violation of Title VII.

148.    As a result, Brown suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SECOND COUNT AGAINST DEFENDANT NYCTA
### (Retaliation in Violation of Title VII)

149.  Brown repeats and realleges each allegation in each paragraph above.

150.  NYCTA's conduct was retaliation for Brown's complaints of discrimination on the basis of race and color and violated Title VII.

151.  As a result, Brown suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## THIRD COUNT AGAINST ALL INDIVIDUAL DEFENDANTS[5]
### (Racial Discrimination in Violation of Section 1981 pursuant to Section 1983)

152.  Brown repeats and realleges each allegation in each paragraph above.

153.  Defendants subjected Brown to differential terms and conditions of employment because of his race, including surveillance and investigation, referral to sham disciplinary charges, reassignment and suspension without pay for five months.

154.  Defendants took the foregoing actions to deprive Brown of equal employment opportunities and other contractual opportunities on account of his race.

155.  Because of Defendants' willful and deliberate actions, and as a proximate cause, Brown has been denied his right to equal employment opportunity in violation of Section 1981 pursuant to Section 1983.

156.  As a result, Brown suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**FOURTH COUNT AGAINST ALL INDIVIDUAL DEFENDANTS**
**(Retaliation in Violation of Section 1981 pursuant to Section 1983)**

157.　Brown repeats and realleges each allegation in each paragraph above.

158.　Defendants' above conduct was retaliation for Brown's discrimination complaints on the basis of race and violated his rights under Section 1981 pursuant to Section 1983.

159.　As a result, Brown suffered loss and damage in an amount to be determined at trial, but estimated to be no less than $100,000.00.

**FIFTH COUNT AGAINST ALL INDIVIDUAL DEFENDANTS**
**(Discrimination in Violation of the Equal Protection Clause**
**pursuant to Section 1983)**

160.　Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

161.　Defendants' conduct was discrimination and retaliation for Plaintiff's discrimination complaints on the basis of race, color, and ancestry, and violated Plaintiffs' rights under the Equal Protection Clause pursuant to Section 1983.

162.　Based on the above, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**SIXTH COUNT AGAINST ALL INDIVIDUAL DEFENDANTS**
**(Retaliation in Violation of the Equal Protection Clause**
**pursuant to Section 1983)**

163.　Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

---

[5] The term "all individual defendants" means all defendants that are persons and does not include Defendants NYCTA and MTA.

164. Defendants' conduct was discrimination and retaliation for Plaintiff's discrimination complaints on the basis of race, color, and ancestry, and violated Plaintiffs' rights under the Equal Protection Clause pursuant to Section 1983.

165. Based on the above, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SEVENTH COUNT AGAINST ALL DEFENDANTS
### (Race and Color Discrimination in Violation of the NYSHRL)

166. Brown repeats and realleges each allegation in each paragraph above.

167. At all relevant times, Brown was an "employee" under the NYSHRL.

168. By adversely affecting the terms, conditions and privileges of Brown's employment because of his race and color, Defendants violated the NYSHRL.

169. As a result, Brown suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## EIGHTH COUNT AGAINST ALL DEFENDANTS
### (Race and Color Discrimination in Violation of the NYCHRL)

170. Brown repeats and realleges each allegation in each paragraph above.

171. At all relevant times, Brown was an "employee" under the NYCHRL.

172. Defendants violated the NYCHRL by adversely affecting the terms, conditions and privileges of Brown's employment because of his race and color.

173. As a result, Brown suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## NINTH COUNT AGAINST ALL DEFENDANTS
### (Retaliation in Violation of NYSHRL)

174. Brown repeats and realleges each allegation in each paragraph above.

175.     Defendants' conduct was retaliation for Brown's complaints of discrimination and violated Brown's rights under the NYSHRL.

176.     All the various actions Defendants took against Brown after he complained of discrimination is unlawful retaliation that violated of the NYSHRL.

177.     By reason of the foregoing, Brown suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## TENTH COUNT AGAINST ALL DEFENDANTS
### (Retaliation in Violation of the NYCHRL)

178.     Brown repeats and realleges each allegation in each paragraph above.

179.     Defendants' conduct was retaliation for Brown's complaints of discrimination and violated his rights under the NYCHRL.

180.     All the various actions Defendants took against Brown after he complained of discrimination is unlawful retaliation in violation of the NYCHRL.

181.     As a result, Brown suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## PUNITIVE DAMAGES

182.     Brown claims punitive damages by reason of the wanton, unrepentant, reckless and egregious conduct of the individual Defendants alleged.

**WHEREFORE,** Brown prays that this Court grant him judgment containing the following relief:

a.     Impanel a jury to hear Brown's claims;

b. An award of damages in an amount to be determined at trial to compensate Brown for his monetary loss and damages, including Brown's loss of past and future earnings, bonuses, compensation, and other employment benefits;

c. An award of damages to compensate Brown for mental anguish, humiliation, embarrassment, and emotional injury for each cause of action;

d. An award of damages in an amount to be determined at trial to compensate Brown for violations of his rights under Title VII, Section 1981, the Equal Protection Clause, the NYSHRL and the NYCHRL;

e. An award of punitive and/or liquidated damages to be determined at the time of trial for the claims under Title VII, Section 1981, the Equal Protection Clause, the NYSHRL, and the NYCHRL;

f. An award of reasonable attorneys' fees and costs related to Brown's claims under Title VII, Section 1981, the Equal Protection Clause, the NYSHRL, and the NYCHRL; and,

g. Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
        April 19, 2024

Respectfully Submitted,


*/s/ Samuel O. Maduegbuna*
SAMUEL O. MADUEGBUNA, ESQ.
**MADUEGBUNA COOPER LLP**
Attorneys for Plaintiff, TODD BROWN
30 Wall Street, 8th Floor
New York, NY 10005
(212) 232-0155

TO:     Defendants

LITTLER MENDELSON, P.C.
Attorneys for Defendants N.Y.C TRANSIT AUTHORITY, METROPOLITAN
TRANSPORTATION AUTHORITY, SARAH E. FEINBERG and JOSEPH NASELLA
900 Third Avenue
New York, New York 10022

Attention:      Jeanne Conley Daves, Esq.


LANKLER SIFFERT & WOHL LLP
Attorneys for Defendant CAROLYN POKORNY
1185 Avenue of the Americas
New York, New York 10036

Attention:      Jillian B. Berman, Esq.
                Daniel E. Reynolds, Esq.
                Zachary B. Shemtob, Esq.

-------------------------------------------------------------------------------------------------

**TODD BROWN,**

*Plaintiff,*

-against-

**NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, SARAH E. FEINBERG, CAROLYN POKORNY, JOSEPH NASELLA, and JOHN and JANE DOE** (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),

*Defendants.*
-------------------------------------------------------------------------------------------------

### SECOND AMENDED COMPLAINT AND JURY DEMAND

-------------------------------------------------------------------------------------------------
**Signature (Rule 130-1.1-a)**

_____
**Print name beneath**
**SAMUEL O. MADUEGBUNA, ESQ.**

_____

*Yours, etc.*

**MADUEGBUNA COOPER LLP**
*Attorneys for Plaintiff*
*30 Wall Street, 8th Floor*
*New York, New York 10005*
*(212) 232- 0155*

**To: All Counsel of Record**
_____
**Service of the within is hereby admitted on**

_____
**Attorneys for**